## Denver & Rio Grande Railway Company v. Chandler.

Where a horse strayed away in the night-time a mile from where he had been turned loose by the owner, and was found by the servants of the appellant railroad company upon one of the bridges on its track — a bridge adapted only for the purpose of railway transportation — and where the animal had broken its leg by slipping it down between the bridge timbers and had to be killed,— *held*, that the company was not liable.

*Appeal from County Court of Conejos County.*

The facts are stated in the opinion.

Mr. John M. Waldron and C. C. Holbrook, for appellant, *ex parte.*

Stone, J.   With the exception of the overruling of the motion for non-suit, we do not think the appellant was prejudiced by the several rulings of the court excepted to in the course of the trial and assigned for error here. The action was brought by appellee, Chandler, against

the appellant railway company to recover the value of a horse injured by going upon a railroad bridge, and thereafter killed by employees of the said company.

The testimony as set out in the record is, in substance, as follows:

The appellee, Chandler, testified:

"I am the plaintiff in this case. On the 1st day of July, A. D. 1882, about 8 o'clock in the morning, I went for my team, and one of my horses was missing. I had turned him out of the stable the evening before. I started out to look for my horse, and I saw the engine backing out pulling my horse off the bridge which crosses the San Antonio river. The horse's foreleg was broken. The engineer shot the horse in the head with a thirty-two caliber pistol; another one of the train-men struck him in the head with an iron bar. They then run the train back to Antonito, and got a Winchester rifle and came back and shot the horse and killed him. The first I saw of the horse, they had a chain around him drawing him off the bridge. He was a brown horse, eight years old, and was worth $125. He was my horse. I am some acquainted with the general value of horses. This occurred in Conejos county, Colorado. I told them that if the horse was worth anything I didn't want him killed. I turned the horse out of the stable the evening before. When I first saw the horse that morning, his foreleg was broken at the joint. I don't know whether it was broken or unjointed; the bone came through the skin. I don't know as the horse was worth anything then. My stable that I turned him out of the evening before is one mile from that bridge. I don't know how long the horse had been on the bridge. That was the first that I saw of the horse after I turned him out. I live in Antonito."

Witness Tozer testified as to the value of the horse a couple of months previous to the killing.

W. F. Moyer, on behalf of plaintiff below, testified as follows:

"On the 1st of July last I was section foreman. Soon after the passenger train started for Espanola, I started out. The train was near the bridge, stopped. They wanted a rope to pull the horse out of the bridge, and I went after one. Mr. Bigelow, one of the train-men, shot the horse. They backed the train back to Antonito to get a gun to kill the horse with. I saw the engine backing from the bridge when they pulled the horse out. His leg was broken when they shot him. I knew the horse before he was killed. I have handled horses a little. He was worth $125. I had him appraised. The horse's leg was broken at the joint. He had got on the bridge the night before,— sometime in the night. I was not there when the horse was first found on the bridge."

At the close of this, the evidence for plaintiff below, the defendant moved for non-suit, which was overruled by the court.

The following testimony was then heard on part of the defendant company:

L. H. Weed testifies:

"I live at Alamosa. I am conductor of the Denver & Rio Grande Railway. I was conductor on the train that left Antonito for Espanola on the 1st day of July, A. D. 1882. We left about 8 o'clock A. M. The bridge over the San Antonio river is about one mile from Antonito. The train began to slack about fifty rods before we got to the bridge; when in twenty or thirty yards of the bridge, it came to a stand-still. I saw a horse fast in the bridge. We left the train and went to the bridge, and found the horse fast in the bridge, with one fore-leg broken. When we found the horse in the bridge, he was not worth anything. We tried to get him out. The train could not pass unless we got him out. We first tried to pry him out with a plank, then we tried to saw him out, and tried to chop him out. We tried to get him out without injuring him any worse than he was when we found him, and we exercised

all the care and caution and diligence in the matter that we could possibly do. No men could have done more if it had been their own property. When we couldn't get the horse out of the bridge any other way, we brought the engine up, and put a chain around the horse's neck, and pulled him out of the bridge with the engine. There were several men there, and all agreed that the horse was worthless, and must be killed. The plaintiff was one of the men who was there. He made no objection to the killing. We then killed the horse. I don't know how long the horse had been in the bridge. The train did not get nearer than twenty yards of the bridge. The bridge is about sixty feet long. The horse was out on the bridge, about fifteen feet from the end of the bridge. The ties on the bridge are close together; I suppose about five or six inches apart. After we had drawn the horse out of the bridge with the engine, the engineer hit him in the head with a hammer, then I shot him with a twenty-two caliber pistol. This not killing him, we ran the train back to Antonito and got a Winchester, and returned and killed the horse with it. The horse's leg was broken when we found him in the bridge, and when we undertook to help him out he commenced to flounder, and the bone came through the skin."

Thomas Murphy, sworn, testifies as follows, to wit:

"I reside at Alamosa. I am road-master on the Denver & Rio Grande Railway, between Antonito and Espanola. I held the same position on the 1st day of July, A. D. 1882. We started out from Antonito with the train for Espanola at about 8 o'clock in the morning on July 1, 1882, and when we got in about two hundred yards of the bridge across San Antonio creek the train began slacking, and when about twenty-five or thirty yards from the bridge, came to a stand-still. When the train stopped I was out walking to see what was the matter. I saw the horse when about forty yards from the bridge. Mr. Weed and myself and the engineer and

some others left the train and went up to the bridge, and found the horse fast in the bridge with one foreleg broken. We tried to pry him out with a plank; we then tried to saw him out, and to chop him out with an ax, but he floundered so that we couldn't chop or saw. We tried to roll him out on a plank; but being unable to get him out otherwise, we put a chain around his neck and brought up the engine and pulled him out that way. The plaintiff and others were present then. It was said by all that the horse was valueless and that he would have to be killed. The plaintiff said the horse was worth nothing to him. The horse was worth nothing when we found him. We exercised all the caution, care and diligence in trying to extricate the horse from the bridge that any men could have done. The horse may have been in the bridge all night, and he may have been there not more than two hours. I was road-master, and was on the train at the time. It was customary, and is still the custom on the road, to slacken the train, but not customary to whistle in a case like that. The engine did not whistle. Mr. Parker was engineer. He is out of the employ of the company and resides, I believe, down here at Antonito. I will be positive that no alarm was given. I gave the section foreman orders to bury the horse and also to have him appraised. I have orders to have all dead stock on the line of the road buried and to report the same. I think Mr. Bigelow shot the horse. I could not see at first, but saw afterwards, that the bone was broken. I don't think the leg was broken after we went there. The reason I thought his leg was broken was that it was bent double. The bone came through after we tried to get him out."

Upon the foregoing evidence the court, to whom the case was tried without a jury, found for plaintiff, and adjudged his damages at $85.

The only question we need consider is whether the state of facts disclosed by the testimony warrants the

judgment. To entitle the appellee to recover there must have been a 'liability cast upon the appellant, arising either *ex contractu* or *ex delicto*. This suit was first brought in a justice's court, and from that appealed to the county court, and so was tried without written or formal pleadings; but it is not pretended that the railway company was liable upon any obligation arising out of contract. To constitute a liability founded upon the fault of the company, it must have been established that there existed a duty on the part of the appellant company, the failure to perform which occasioned the loss of the horse. The only duty in this case that can possibly be supposed is that the company should have prevented the animal from going upon the bridge where he was injured. But here there was no law which imposed such duty upon the company, neither by fencing nor by any other means. The horse had strayed away in the night-time a mile from where he was turned loose by the owner, and was found by servants of the company upon one of the bridges on its track,— a bridge adapted only for the purposes of railway transportation,— and where the animal had broken a leg by slipping it down between the bridge timbers. To extricate the animal from the bridge was a necessity to appellant; to kill it was an act of humanity; and by such killing the owner suffered no greater or further injury or loss than the previous accidental breaking of the horse's leg, which rendered it wholly valueless. There is no dispute as to the facts. The owner was himself present when the horse was extricated and killed, and the only question for us to determine is one of legal liability on the part of the appellant. We do not hesitate to say that there was no such liability. The appellee turned his horse loose upon the common at his peril. The appellant was entitled to his non-suit; but since a new trial could not, upon the undisputed facts of the case, have presented a different cause of action or worked a different result, we must reverse

the judgment for error in the court in awarding it when there is nothing in the case to support it.

Judgment reversed and cause remanded, with direction to dismiss the complaint.

*Reversed.*